UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| ARIZANT HOLDINGS INC.; ARIZANT INC.; and ARIZANT HEALTHCARE, INC., | Case No. 08-CV-1273 (PJS/JJG) |
| Plaintiffs, | ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| GREGORY GUST, | |
| Defendant. | |

Andrew S. Hansen and Meghan M. Anzelc, OPPENHEIMER WOLFF & DONNELLY, LLP, for plaintiffs.

Joseph M. Sokolowski and Ellen C. Meyer, FREDRIKSON & BYRON, P.A., for defendant.

Plaintiffs Arizant Holdings Inc., Arizant Inc., and Arizant Healthcare, Inc. (collectively "Arizant") bring claims of breach of contract and misappropriation of trade secrets against defendant Gregory Gust, a former employee of Arizant. This matter is before the Court on the parties' cross-motions for summary judgment. Because Arizant has failed to show that it has suffered or is likely to suffer any harm from any of Gust's allegedly wrongful acts, the Court grants Gust's motion and denies Arizant's.

## I. BACKGROUND

### A. Gust's Employment with Arizant

Arizant[1] produces and sells patient-warming systems. Arizant's products include, among other things, the "Bair Hugger" system, which uses forced air to prevent hypothermia in surgical patients, and the "Bair Paws" system, which is a patient-adjustable warming device built into a

---

[1]Arizant is the successor to Augustine Medical, Inc. Unless otherwise noted, all references to Arizant are intended to include Augustine Medical, Inc.

disposable gown. Maharaj Dep. 12. Gust worked as a regional sales manager for Arizant from 1994 through 2007. Gust Dep. 37 & Ex. 4 ¶ 1. During his tenure at Arizant, Gust was responsible for the "Great Lakes" sales region, which encompassed Ohio, West Virginia, Canada, and parts of Indiana, Delaware, Michigan, Pennsylvania, and Kentucky. Maharaj Dep. 19.

By 2007, Gust's performance was declining, and his sales region was falling behind other sales regions. Maharaj Dep. 57-58. Arizant gave Gust the choice of following a performance-improvement plan or accepting a severance package. Maharaj Dep. 57. Gust chose to accept the severance package and resigned effective December 31, 2007. Maharaj Dep. 57; Gust Dep. Ex. 4 ¶ 1.

 While Gust was at Arizant, he signed three agreements that are relevant to this case:

First, when Gust joined Arizant in 1994, he signed an "Employee Confidentiality Agreement" ("Confidentiality Agreement"). Gust Dep. Ex. 1. The Confidentiality Agreement prohibits Gust from disclosing or using confidential information to which Gust had access in connection with his employment.

Second, in 2004, Gust signed a "Joinder" to a "Securities Exchange, Purchase and Holders Agreement" ("Securities Agreement"). Gust Dep. Exs. 2, 3. The Securities Agreement permitted Gust to purchase Arizant shares, but also subjected Gust to certain "Non-Compete Undertakings." For the sake of simplicity, the Court will generally refer to the "Non-Compete Undertakings" found within the Securities Agreement as the "Noncompete Agreement."

Broadly speaking, the Noncompete Agreement provides that, after Gust's employment with Arizant ends, Gust may not engage in the business of developing, producing, marketing, or

selling products that compete with an Arizant product where either (1) Gust had direct involvement with that product while he was employed by Arizant or (2) that product accounted for at least 5 percent of Arizant's total sales during the twelve months preceding the termination of Gust's employment. Gust Dep. Ex. 2 § 7.1. The Noncompete Agreement applies both to products that Arizant actually developed, produced, marketed, or sold, and to products that Arizant merely planned to develop, produce, market, or sell. The Noncompete Agreement is not limited to Gust's customers or even to Arizant's customers; rather, it prohibits Gust from engaging in a competing business for anyone in any capacity. Moreover, the Noncompete Agreement does not contain any geographic restriction; it prohibits Gust from engaging in a competing business anywhere in the world. The noncompete period is, however, limited to 365 days after Gust's employment with Arizant ends, although the Noncompete Agreement contains a provision that tolls the 365-day period during any period in which Gust is violating his obligations. Gust Dep. Ex. 2 § 7.1(a), (c).

The third and final agreement relevant to this case is a "Separation Agreement and General Release" ("Separation Agreement"), which was signed by Gust on December 20, 2007, after he agreed to resign and accept a severance package. Gust Dep. Ex. 4. Under the Separation Agreement, Gust released all claims he might have against Arizant. In exchange for Gust's release of claims, Arizant paid Gust $79,600.00 in severance pay and made a $5,408.10 contribution to Gust's COBRA coverage. Gust Dep. Ex. 4 ¶ 2(A); Rock Aff. ¶ 2. The Separation Agreement contains a merger clause providing that Gust and Arizant have no other agreements, save for the Securities Agreement, which remains in full force and effect. Gust Dep. Ex. 4 ¶ 14.

*B. Gust's Post-Arizant Employment*

Shortly after leaving Arizant, Gust contacted Scott Augustine, the founder of Arizant's predecessor and one of the original inventors of Arizant's patient-warming technology. Gust Dep. 62-63; Rock Aff. ¶ 3. After leaving Arizant in 2002, Augustine had invented a new type of patient-warming technology — the "Hot Dog" patient-warming system — and started a number of companies to produce and sell it. B. Augustine Aff. ¶ 3. These companies include Augustine Biomedical + Design LLC ("ABD"), which develops Hot Dog products; Augustine Biomedical International, LLC ("AB International"), which contracts with international distributors to sell Hot Dog products outside of the United States; and Hot Dog International, LLC ("HD International"), which controls the rights to intellectual property and marketing materials for the Hot Dog products. B. Augustine Aff. ¶ 3.

In January or February 2008, Gust became a consultant for AB International. Gust Dep. 71, 73 & Ex. 10; Anzelc Aff. Ex. D (Gust expense report for January 2008). Initially, his duties were to consult with AB International about the training and support of distributors in the international market. Gust Dep. 74. Gust also staffed a booth promoting Hot Dog products at a trade show in April 2008. Gust Dep. 108-11; Maharaj Dep. 71. As a consultant for AB International, Gust worked primarily in the Canadian market. B. Augustine Dep. 18.

While Gust was consulting for AB International, he was also preparing to serve as president of a new Augustine-related entity that would market Hot Dog products in the United States. Gust Dep. 74. This new entity, Hot Dog USA, LLC ("HD USA"), was formed in June 2008. B. Augustine Dep. 73. Scott Augustine's sons — Brent, Ryan, and Garrett Augustine — were all members of HD USA's board of directors. Gust Dep. 124.

Gust helped set up HD USA and helped to plan its future operations in the United States. Gust Dep. 91. Among other things, Gust negotiated agreements between HD USA and distributors in the United States. Gust Dep. 92, 99-100; B. Augustine Dep. 21. Gust also developed sales projections and a training manual for distributors. Gust Dep. 98-99, 104-05. Gust officially began serving as president of HD USA on November 1, 2008, although he began publicly identifying himself as HD USA's president a few months earlier. Gust Dep. 94-95.

Gust struggled as president of HD USA. Over the course of Gust's tenure, the company made exactly two sales, and Gust had no involvement with either sale. B. Augustine Aff. ¶ 10. Neither of the two sales was in Gust's former sales territory. B. Augustine Aff. ¶ 10. HD USA fired Gust in June 2009. B. Augustine Aff. ¶ 9.

### C. The Forwarded E-mails

As noted, Gust resigned from Arizant effective December 31, 2007, but Arizant allowed Gust to continue to use his Arizant e-mail account for a few weeks in January 2008. Maharaj Dep. 75. During those few weeks, Gust forwarded a number of Arizant e-mails to his personal e-mail account. *See* Gust Dep. Exs. 14-19, 21-23; Rock Aff. Exs. A-H. In February 2008, Gust forwarded one of these e-mails to Brent Augustine with the instruction "forward this to Scott" (presumably Brent's father, Scott Augustine). Anzelc Aff. Ex. E. At the time, Brent Augustine worked for ABD as a product manager. B. Augustine Dep. 17-18.

### I. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006). In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004). The parties agree that, pursuant to a choice-of-law clause the Separation Agreement, Minnesota law governs this dispute. Gust Dep. Ex. 4 ¶ 13.

### B. Breach of Noncompete Agreement

Arizant alleges that Gust breached the Noncompete Agreement by working as a consultant to AB International, by working as president of HD USA, and by soliciting Arizant customers on HD USA's behalf. Arizant seeks an injunction prohibiting further violations of the Noncompete Agreement, as well as the return of the $79,600.00 in severance pay and $5,408.10 in COBRA contributions that Arizant gave Gust in return for his signature on the Separation Agreement.

The Noncompete Agreement states, in relevant part, as follows:

7.1    Non-Compete Undertakings.

(a)    General. Each Management Investor agrees that for so long as he or she is employed by the Company or any of its subsidiaries, and for a period of 365 days after the termination or cessation of his or her employment for any reason, the Management Investor will not directly or indirectly:

(i) As an individual proprietor, partner, stockholder, officer, employee, director, joint venturer, investor, lender, or in any other capacity whatsoever (other than as the holder of not more than two percent (2%) of the total outstanding stock of a publicly held company), engage in the business of developing, producing, marketing or selling products or rendering services of the kind or type developed or being, or planned to be within the next twelve months following the termination or cessation of employment, developed, produced, marketed or sold, by the Company or any of its subsidiaries while the Management Investor was employed by the Company or any of its subsidiaries, including the business of providing products, services and information regarding airway management, advanced wound care (excluding traditional wound dressings such as gauze, hydrogels and transparent films), and the control of hypotherma [sic] during and after surgery where either (x) the Management Investor had substantive, direct involvement with such products, services or information, or (y) such products, services or information accounted for 5% or more of total sales of the Company during the previous 12 months. . . .

(iii) Solicit, divert or take away, or attempt to divert or to take away, the business or patronage of any of the clients, customers or accounts, or prospective clients, customers or accounts, of the Company or any of its subsidiaries which were contacted, solicited or served by the Company. . . .

(c) Accruing of Time. If the Management Investor violates the provisions of Section 7.1(a) of this Agreement, he or she shall continue to be bound by the restrictions set forth in Section 7.1(a) of this Agreement until an aggregate of 365 days (which need not be consecutive) after the date of

-7-

> termination of the Management Investor's employment has
> expired without any violation of Section 7.2(a) [sic] of this
> Agreement.

Gust Dep. Ex. 2 § 7.1.

There is no doubt that Gust violated the literal terms of the Noncompete Agreement. While Gust was working for AB International and then HD USA, he was "engage[d] in the business of . . . marketing or selling products . . . of the kind or type developed . . . produced, marketed or sold, by [Arizant] while [Gust] was employed by [Arizant]" and in which Gust "had substantive, direct involvement . . . ."

Gust does not deny that he violated the Noncompete Agreement. Rather, he argues that the Noncompete Agreement is invalid — in whole or in part — because it is overbroad. Gust argues further that, even if the Noncompete Agreement is valid, he is still not liable to Arizant because Arizant has failed to submit any evidence that it was damaged by his violations.

The Court is inclined to agree with Gust that the Noncompete Agreement is overbroad and, at a minimum, would need to be modified under the blue-pencil doctrine. *See Hilligoss v. Cargill, Inc.*, 649 N.W.2d 142, 147 n.8 (Minn. 2002) ("This [blue-pencil] doctrine, which has been adopted in Minnesota, allows a court at its discretion to modify unreasonable restrictions on competition in employment agreements by enforcing them to the extent reasonable."). The Court need not resolve this issue, though, because even if the Noncompete Agreement is enforced as written, Arizant is not entitled to damages for Gust's breach. Arizant has simply failed to submit any evidence that it suffered any harm as a result of Gust's employment with AB International and HD USA. As mentioned above, during Gust's tenure at HD USA, HD USA made exactly two sales, neither of which involved Gust or even a customer located in

Gust's former territory. Arizant has not identified a single customer — or a single sale — that it lost as a result of Gust's breach of the Noncompete Agreement.

Arizant contends that such evidence is not necessary, arguing that it could have been harmed by its customers making a trial use of the Hot Dog products. But to avoid summary judgment, Arizant must do more than speculate about how it *might* have been harmed; it must submit evidence that it *was* harmed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Arizant has not offered any evidence that any of its customers *did* make a trial use of a Hot Dog product and that Arizant was harmed as a result.

Without any evidence of lost customers, lost sales, or lost profits, Arizant argues that it nevertheless suffered harm when it paid $79,600.00 in severance pay and $5,408.10 in COBRA contributions pursuant to the Separation Agreement. Arizant claims that it made the severance payments and COBRA contributions in reliance on Gust's earlier agreement not to compete. That is simply not true. The Separation Agreement and the Noncompete Agreement are two independent contracts. When Gust signed the Separation Agreement in 2007, he was already bound by the Noncompete Agreement that he had signed in 2004. Arizant had absolutely no reason to pay additional consideration to induce Gust to commit to do what he was already committed to do. Instead, the money that Arizant paid pursuant to the Separation Agreement was in exchange for Gust's promise to release Arizant from any claims he may have had. Arizant got what it paid for; Gust has not brought any claims against Arizant, and, if he did, Gust's claims would be dismissed pursuant to the Separation Agreement.

Arizant contends, though, that the Separation Agreement is not separate from the Securities Agreement. Instead, says Arizant, the Separation Agreement incorporated the

Securities Agreement, and thus the consideration paid for the Separation Agreement was paid in part for the Securities Agreement.

Arizant's argument is contradicted by the plain terms of the Separation Agreement. Not one word of the Separation Agreement requires Gust to comply with the Securities Agreement. (That is hardly surprising given that, at the time Gust signed the Separation Agreement, he was already obligated to comply with the Securities Agreement.) Instead, the Separation Agreement simply makes clear that it does not modify the rights and obligations that the parties *already have* under the Securities Agreement. Gust Dep. Ex. 4 ¶ 14 (providing that the Securities Agreement "shall remain in full force and effect").[2]

Arizant also seeks an injunction enforcing the terms of the Noncompete Agreement.

> In Minnesota, the "party seeking the injunction must establish that his legal remedy is not adequate, . . . and that the injunction is necessary to prevent great and irreparable injury." *Cherne Indus., Inc. v. Grounds & Assocs.*, 278 N.W.2d 81, 92 (Minn. 1979) (internal citation omitted). The injury must be of such a nature that money damages alone do not provide adequate relief. *Morse v. City of Waterville*, 458 N.W.2d 728, 729-30 (Minn. Ct. App.1990), *rev. denied* (Minn. Sept. 28, 1990). "[T]he burden is on the moving party to establish the material allegations."

---

[2]As an aside, the Court notes that, if the Separation Agreement did incorporate the Securities Agreement (as Arizant argues), then Arizant would seem to be seeking rescission of the Separation Agreement when it asks for return of the $79,600.00 in severance pay and $5,408.10 in COBRA contributions that it provided as consideration for that agreement. It is not clear, though, whether the Court could grant rescission, because it is not clear whether Gust could be put back into the position he was in before he signed the Separation Agreement. *See Johnny's, Inc. v. Njaka*, 450 N.W.2d 166, 168 (Minn. Ct. App. 1990) ("Upon rescission the parties must be put in the same position they would have been had the contract never existed."). Moreover, if the Securities Agreement was incorporated into the Separation Agreement, then rescission of the Separation Agreement would presumably have the effect of rescinding the incorporated Securities Agreement, and that, in turn, would leave Arizant without any noncompete provision to enforce in this action.

-10-

> *Hideaway, Inc. v. Gambit Invs. Inc.*, 386 N.W.2d 822, 824 (Minn.
> Ct. App.1986).

*Hinz v. Neuroscience, Inc.*, 538 F.3d 979, 986 (8th Cir. 2008) (alterations in original). Arizant's

request is premised on its argument that, under the tolling provision of the Noncompete

Agreement, the Agreement remains in effect. *See* Gust Aff. Ex. 2 § 7.1(c).

It is not clear whether the tolling provision on which Arizant relies is enforceable.

Although the Minnesota Supreme Court does not seem to have addressed the issue, several states

have held that such tolling provisions are not enforceable. *See, e.g., H&R Block E. Enters., Inc.

v. Swenson*, 745 N.W.2d 421, 427-28 (Wis. Ct. App. 2007) (holding that a tolling provision in a

noncompete agreement was unreasonable because it indefinitely extended the term of the

agreement). But even assuming that the tolling provision is enforceable under Minnesota law,

Arizant is still not entitled to the injunction it seeks.

As discussed above, Arizant has not shown that it suffered *any* harm — reparable or

irreparable — as a result of Gust's breaches. Nor has Arizant shown that it will suffer harm as a

result of a future breach of the Noncompete Agreement. Gust is now unemployed. There is no

evidence that he will work in the near future in any capacity, much less in a capacity that would

violate the Noncompete Agreement.

Moreover, it has been nearly two years since Gust left Arizant. During the months

immediately following his resignation — when, presumably, Gust was in an ideal position to

exploit any competitive edge that he had gained by working at Arizant — Gust was unable to

lure even one customer away from Arizant or to deprive Arizant of even one sale. Under these

circumstances, Arizant has failed to show that an "'injunction is necessary to prevent great and

irreparable injury.'" *Hinz*, 538 F.3d at 986 (quoting *Cherne Indus.*, 278 N.W.2d at 92). Because

Arizant is not entitled to any relief on its claim for breach of the Noncompete Agreement, Gust's

motion for summary judgment on this claim is granted.

### C. Breach of Confidentiality Agreement

Arizant next alleges that Gust violated the terms of the Confidentiality Agreement. Gust

Dep. Ex. 1. Unfortunately for Arizant, though, the Separation Agreement plainly abrogated the

Confidentiality Agreement. As a result, nothing that Gust did after leaving Arizant could have

violated the Confidentiality Agreement, and nothing that Gust does in the future could violate

the Confidentiality Agreement. The Confidentiality Agreement is a dead letter.

The Separation Agreement provides as follows:

> This Agreement, and all agreements referenced in this Agreement, contains the entire agreement between you and the Company with respect to your employment and separation from employment and there are no promises or understandings outside of this Agreement with respect to your employment or your separation from employment with the Company, except that your Securities Exchange, Purchase and Holders Agreement and your Joinder to Securities Exchange, Purchase and Holders Agreement shall remain in full force and effect. Any modification of or addition to this Agreement must be in a writing signed by you and the Company.

Gust Dep. Ex. 4 ¶ 14. This language is clear: There are no agreements between Arizant and

Gust regarding Gust's employment at Arizant or Gust's separation from Arizant except (1) the

Separation Agreement, (2) the Securities Agreement, and (3) any other agreements referred to in

the Separation Agreement. The Separation Agreement does not refer to the Confidentiality

Agreement, and thus the Confidentiality Agreement does not survive the Separation Agreement.

Arizant argues, however, that the Separation Agreement abrogates only prior agreements

"with respect to [Gust's] employment or [Gust's] separation from employment with [Arizant]."

Arizant further argues that the Confidentiality Agreement was not such a prior agreement because it "does not deal at all with the terms of Gust's employment or separation." Pls.' Mem. Opp. Mot. SJ 17.

Arizant's argument is meritless, as even a cursory glance at the Confidentiality Agreement reveals. To begin with, the full title of the Confidentiality Agreement is the "*Employee* Confidentiality Agreement" — rather clear evidence that the Agreement relates to Gust's *employment*. Gust Dep. Ex. 1 (emphasis added). More importantly, the whole point of the Confidentiality Agreement is to govern Gust's use of information that he acquires in his capacity as an employee of Arizant. The Agreement states that the parties entered into the Agreement "[i]n recognition of . . . Employee's duties and responsibilities as an employee of the company, and in consideration of Employee's employment opportunities with the Company . . . ." Gust Dep. Ex. 1 at 1. The Agreement provides that "Employee shall not directly or indirectly disclose or use at any time, either during or subsequent to his or her employment by the Company . . . any [confidential information] possessed or utilized by the Company or to which Employee gains access *in connection with his or her employment . . . .*" Gust Dep. Ex. 1 § 1 (emphasis added). A Confidentiality Agreement that specifically governs information that Gust learns "in connection with his . . . employment" is clearly an agreement "with respect to [Gust's] employment." Gust Dep. Ex. 4 ¶ 14.

The Agreement is just as obviously an agreement "with respect to [Gust's] . . . separation from employment." Gust Dep. Ex. 4 ¶ 14. As noted, the Agreement provides that Gust shall not disclose or use confidential information "either during *or subsequent to* his . . .

employment by [Arizant]." Gust Dep. Ex. 1 § 1 (emphasis added). And the Agreement imposes

additional obligations on Gust in connection with the "termination of his . . . employment":

> Upon termination of his or her employment, Employee shall
> promptly deliver to the Company all notes, memoranda,
> notebooks, drawings, customer lists or other documents delivered
> to Employee concerning any idea, product, apparatus,
> Invention . . . or process manufactured, used, developed,
> investigated, or marketed by the Company during the period of his
> or her employment.

*Id.*

Without question, then, the Confidentiality Agreement is an agreement "with respect to

[Gust's] employment or . . . separation from employment with [Arizant]." Therefore, under the

plain terms of the Separation Agreement, the Confidentiality Agreement is no longer in force.

The Court grants Gust's motion for summary judgment on this claim.[3]

### D. Misappropriation of Trade Secrets

Finally, Arizant alleges that Gust misappropriated trade secrets in violation of the

Uniform Trade Secrets Act, Minn. Stat. §§ 325C.01-.08 ("UTSA"), and the common law.

Arizant's trade-secret claim is based entirely on the e-mails that Gust forwarded to himself in

January 2008, when Arizant permitted Gust to continue to use his Arizant e-mail account even

though Gust was no longer employed by the company. Arizant seeks only injunctive relief with

respect to this claim.

---

[3]Arizant's claim for breach of the Confidentiality Agreement essentially mirrors its claim
for misappropriation of trade secrets. Both claims are based on the e-mails that Gust forwarded
to himself after he left Arizant, and Arizant seeks only injunctive relief with respect to both
claims. As discussed below, Arizant is not entitled to injunctive relief with respect to its trade-
secrets claim because it has failed to offer any proof that Gust still possesses the e-mails. For the
same reason, Arizant would not be entitled to injunctive relief on its claim for breach of the
Confidentiality Agreement even if the agreement were still in effect.

To prevail on its trade-secret claim, Arizant must show (1) the existence of a trade secret and (2) improper acquisition, disclosure, or use of the trade secret. Minn. Stat. § 325C.01, subd. 3; *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 897 (Minn. 1983). A trade secret is information that (1) is not generally known or readily ascertainable; (2) derives independent economic value from secrecy; and (3) Arizant has made reasonable efforts to keep secret. Minn. Stat. § 325C.01, subd. 5; *Electro-Craft*, 332 N.W.2d at 899-901.

1. Improper Acquisition, Disclosure, or Use

As noted, the UTSA forbids the improper acquisition, disclosure, and use of a trade secret. There is no evidence that Gust improperly used any of the information contained in the e-mails that he forwarded to himself. Likewise, with one exception (discussed below), there is no evidence that Gust improperly disclosed any information contained in any of those e-mails. In the main, then, Arizant's trade-secrets claim is based on its contention that, when Gust forwarded the e-mails to himself, he improperly *acquired* a trade secret of Arizant's.

The UTSA defines "misappropriation" to include "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means . . . ." Minn. Stat. § 325C.01, subd. 3(i). "Improper means," in turn, is defined to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means . . . ." Minn. Stat. § 325C.01, subd. 2.

Arizant had no policy against forwarding company e-mails to personal e-mail accounts. Maharaj Dep. 93-94. Arizant nevertheless argues that Gust's act of forwarding the e-mails violated the Confidentiality Agreement. As explained above, though, the Confidentiality Agreement was abrogated by the Separation Agreement, and thus Gust was not bound by the

Confidentiality Agreement at the time he forwarded the e-mails to himself. Moreover, even if the Confidentiality Agreement had remained in effect, it would have prohibited only the *disclosure* or *use* of confidential information; it did not prohibit Gust from *acquiring* confidential information. *See* Gust Dep. Ex. 1 ¶ 1 (stating that "Employee shall not directly or indirectly disclose or use" Arizant's confidential information).

Arizant also makes much of the fact that Gust was no longer an employee of Arizant when he forwarded e-mails from his Arizant account to his personal account. But it is undisputed that, at the time Gust forwarded the e-mails, Gust had Arizant's permission to use his Arizant account. There is no evidence that Arizant imposed any conditions on Gust's use of his account during this time. It is true, as Arizant points out, that Gust had asked for continued access to his Arizant e-mail account so that he could notify his salespeople that he was leaving Arizant. Maharaj Dep. 75. But there is no evidence that Arizant told Gust that he could use his Arizant e-mail account only for this purpose.

In sum, there is no evidence that Gust violated any Arizant policy or directive or otherwise acted improperly when he forwarded the e-mails from his Arizant account to his personal account. Without such evidence, a factfinder cannot conclude that Gust's act of forwarding the e-mails to himself constituted improper acquisition of trade secrets under the UTSA. *Cf. Electro-Craft*, 332 N.W.2d at 903 (to show misappropriation through improper means, a plaintiff must show some duty on the part of the employee not to disclose the information).

## 2. Existence of a Trade Secret

Gust did disclose one of the forwarded e-mails to a third party. Specifically, Gust forwarded one of the e-mails to Brent Augustine (and another ABD employee), and asked Brent Augustine to send the e-mail on to his father, Scott Augustine. Anzelc Aff. Ex. E. But the disclosure of this single e-mail does not support a claim under the UTSA because the information contained in the e-mail does not constitute a trade secret.

The disclosed e-mail contained a list of five websites that, according to the e-mail, would give the reader "a good start for seeing what's new" with respect to several health-care initiatives, including the Institute for Healthcare Improvement ("IHI"), the Surgical Care Improvement Project ("SCIP"), and pay-for-performance plans ("P4P"). As far as the record discloses, all of these initiatives are well known in the health-care community, and anyone who uses Google or another popular search engine to seek information about these initiatives could easily find the listed websites. Arizant has not offered any evidence that anything about the initiatives or the websites was secret. Arizant has not offered any evidence that it would be difficult or time-consuming to compile this list of websites. And Arizant has not offered any evidence that a competitor of Arizant's who had access to the e-mail would learn anything specific about Arizant's sales or marketing strategy.[4] *Cf. Electro-Craft*, 332 N.W.2d at 896, 899-900 (affirming trial court's finding that the design of a motor was not readily ascertainable where

---

[4]John Rock, the Senior Director of Legal Affairs for Arizant, avers that this e-mail, in combination with several other e-mails, discloses Arizant's specific sales and marketing strategy in response to new regulations. Rock Aff. ¶ 5. Rock then asserts that "this information" — that is, Arizant's specific sales and marketing strategy — is not generally known or readily ascertainable. Rock Aff. ¶ 5. But only the e-mail listing the websites — and not any other e-mail — was disclosed by Gust. Rock does not explain how someone who was provided only this one e-mail could discern anything specific about Arizant's sales or marketing strategy.

the plaintiff offered evidence that it would take up to a year to reverse-engineer the motor);

*Strategic Directions Group, Inc. v. Bristol-Meyers Squibb Co.*, 293 F.3d 1062, 1065 (8th Cir. 2002) (although a novel or unique combination of known elements may in some cases constitute a trade secret, the simple assertion that a trade secret resides in some combination of otherwise known data is insufficient).  Under these circumstances, no reasonable factfinder could conclude that, in forwarding an e-mail containing a list of websites, Gust was disclosing a trade secret of Arizant's.[5]

### 3.  Injunction

Finally, even assuming that all of the elements of a trade-secret claim are met, Arizant has nevertheless failed to establish that it is entitled to injunctive relief.  There is no evidence that Arizant has suffered any harm from Gust's misappropriation of the e-mails or from Gust's disclosing one of the e-mails to Brent Augustine.  There is no evidence that Gust plans to disclose any of the e-mails in the future; indeed, there is no evidence that Gust still *possesses* the e-mails.  Finally, there is no evidence that, even if Gust still possesses the e-mails, and even if he had some reason to disclose them to a third party in the future, such disclosure of these almost two-year-old e-mails would cause "'great and irreparable injury'" to Arizant.  *Hinz*, 538 F.3d at 986 (quoting *Cherne Indus.*, 278 N.W.2d at 92).  Arizant is not entitled to an injunction.[6]

---

[5]Arizant also argues that it is entitled to an injunction if Gust disclosed confidential information, even if that information did not constitute a trade secret.  *See Saliterman v. Finney*, 361 N.W.2d 175, 178-79 (Minn. Ct. App. 1985).  But the e-mail that Gust disclosed is not marked "confidential" and the information it contains is readily ascertainable.  There is thus no basis on which a factfinder could conclude that the e-mail contains confidential information.  *See Jostens, Inc. v. Nat'l Computer Sys., Inc.*, 318 N.W.2d 691, 702 (Minn. 1982) ("Confidential information is that which an employee knew or should have known was confidential.").

[6]The Court is aware that each party has brought a motion to compel the other party to provide additional discovery.  But both parties moved for summary judgment, and neither party

-18-

* * *

Gust acted wrongly, but his wrongful actions did not harm Arizant, and there is no reason to believe that Gust will be able to harm Arizant in the future. This lawsuit no longer has a reason for being, except as a means for Arizant to wreak vengeance on Gust and the Augustine companies (which are paying for Gust's defense). That is not a proper use of the federal courts. Gust's motion for summary judgment is granted.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1.   Plaintiffs' motion for summary judgment [Docket No. 21] is DENIED.

2.   Defendant's motion for summary judgment [Docket No. 15] is GRANTED.

3.   Plaintiffs' complaint [Docket No. 1] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

4.   The parties' motions to compel [Docket Nos. 55 and 64] are DENIED AS MOOT.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: October 21, 2009

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge

---

asked the Court to delay ruling on their dispositive motions pending resolution of the motions to compel. The Court therefore denies the motions to compel as moot.